**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3947
_____

UNITED STATES OF AMERICA

v.

JOSEPH W. NAGLE,
                    Appellant

_____

No. 16-1543
_____

UNITED STATES OF AMERICA

v.

ERNEST G. FINK,
                    Appellant

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Nos. 1-09-cr-00384-001 and 1-09-cr-00384-002)
District Judge: Hon. Sylvia H. Rambo
_____

Submitted under Third Circuit L.A.R. 34.1(a)
October 6, 2016
_____

Before: SHWARTZ, COWEN, and ROTH, <u>Circuit Judges</u>.

(Filed: November  30, 2016)

_____

OPINION[*]
_____

SHWARTZ, Circuit Judge.

In 2015, this Court vacated the sentences of Joseph Nagle and Ernest Fink ("Defendants"), holding that in cases such as this one involving the fraudulent procurement of federally-sponsored construction contracts designated for disadvantaged business entities ("DBEs"), "the District Court should calculate the amount of loss under § 2B1.1 [of the United States Sentencing Guidelines] by taking the face value of the contracts and subtracting the fair market value of the services rendered under those contracts," including the cost of materials, labor, and the transportation and storage of goods. United States v. Nagle, 803 F.3d 167, 183 (3d Cir. 2015) ("Nagle I"). On remand, the District Court calculated the loss as equivalent to the profits Defendants earned on the fraudulently procured contracts. For the reasons set forth herein, we will affirm.

I

In 2004, Joseph Nagle inherited a 50.1% stake in Schuykill Products, Inc. ("SPI"), a Pennsylvania-based manufacturer of concrete beams, and its wholly-owned subsidiary, CDS Engineers, Inc. ("CDS"), a construction company. Ernest Fink joined SPI in 1970 and owned 49.9% the company. Neither SPI nor CDS has ever qualified as a DBE.[1]

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.
[1] As we explained in Nagle I,

In 1993, SPI entered into an arrangement with Marikina Engineers and Construction Corp. ("Marikina"), a Pennsylvania-certified DBE. Pursuant to the arrangement, "Marikina would bid to serve as a subcontractor for PennDOT and SEPTA[2] contracts that had DBE participation requirements," including projects requiring both the provision and installation of concrete beams for bridge construction. Id. at 172. "If Marikina was selected for the subcontracts, SPI and CDS would perform all of the work on those contracts. SPI and CDS would pay Marikina a fixed fee for its participation but otherwise keep the profits of the scheme." Id. Between 1993 and 2008, SPI and CDS, acting through Marikina, fraudulently procured and subsequently completed 336 federally-sponsored contracts totaling approximately $135 million.

In 2009, Nagle and Fink were charged with multiple crimes relating to the scheme. Fink pleaded guilty to conspiring to defraud the United States. Nagle proceeded to trial

---

[a] DBE is a for-profit small business that is at least 51% owned by an individual or individuals who are both socially and economically disadvantaged and whose management and daily operations are controlled by one or more of the disadvantaged individuals who own it. [49 C.F.R.] § 26.5. . . . States themselves certify businesses as DBEs. Id. § 26.81. A business must be certified as a DBE before it or a prime contractor can rely on its DBE status in bidding for a contract. Id. § 26.81(c).

[Significantly], in order to count towards a contract's DBE participation, a DBE must "perform[ ] a commercially useful function on [the] contract." Id. § 26.55(c). Therefore, a certified DBE whose "role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation" cannot be counted towards DBE participation. Id. § 26.55(c)(2).

Nagle I, 803 F.3d at 171.
2 "PennDot" refers to the Pennsylvania Department of Transportation; "SEPTA" to the Southeastern Pennsylvania Transportation Authority.

and was convicted of the same crime, as well as multiple counts of wire fraud, mail fraud, and money laundering. Prior to sentencing, the Probation Office calculated the total amount of loss for which Nagle and Fink were responsible under § 2B1.1 as the face value of the fraudulently procured contracts. Nagle and Fink objected, arguing that the appropriate measure of loss in this case is the profit they received, and that, at a minimum, they were entitled to offset the face value of the contracts by "the fair market value of the property returned and the services rendered," consistent with Application Note 3(E)(i). See U.S.S.G. § 2B1.1 cmt. n.3(E)(i). The District Court rejected this approach, concluding that the DBE program is a "government benefits program" as defined in Application Note 3(F)(ii), and that, as a result, the loss was "not less than the value of the benefits obtained by unintended recipients," U.S.S.G. § 2B1.1 cmt. n.3(F)(ii), which it determined was the face value of the fraudulently-procured contracts, since "the entire DBE portions of the contracts were diverted to unintended recipients." Nagle Appendix ("N. App.") 142-44. Applying this rule, the District Court held Fink responsible for a loss of approximately $135 million, the face value of all of the contracts fraudulently procured, and Nagle responsible for a loss of approximately $54 million, the face value of the contracts fraudulently procured during his four years as the majority owner of SPI/CDS. Each Defendant moved for a ten-level downward departure, arguing that the loss amount overstated the seriousness of his offense. The Government did not oppose the motions and, after granting them, the District Court sentenced Nagle and Fink to 84 months' and 51 months' imprisonment, respectively.

On appeal, we held that the District Court erred in declining "to allow a credit for

4

the fair market value of the services rendered against the face value of the contracts." Nagle I, 803 F.3d at 183. More specifically, we held that regardless of whether Note 3(E)(i) or Note 3(F)(ii) is applied, "the District Court should calculate the amount of loss under § 2B1.1 by taking the face value of the contracts and subtracting the fair market value of the services rendered under those contracts." Id. "If possible and when relevant," we added, "the District Court should keep in mind the goals of the DBE program that have been frustrated by the fraud." Id.

Considering such goals, the District Court stated on remand that Defendants' fraud prevented legitimate DBEs from earning a profit "and form[ing] and strengthen[ing] valuable industry connections," concluded that "the amount of profits diverted from legitimate DBEs" is the appropriate measure of loss in this case, and held Nagle and Fink responsible for loss amounts of $850,931.20 and $1,037,828.61, respectively.[3] N. App. 12-13. The District Court next stated that its previous sentences and downward departures similarly "reflected the profits that would have been received by legitimate DBEs." N. App. 13. Applying the Guidelines in effect at the time of their respective resentencings, the District Court again sentenced Nagle to 84 months' imprisonment and sentenced Fink to 41 months' imprisonment.[4] Both Defendants appeal.

---

[3] In the sentencing memoranda filed before their initial sentencings, Nagle and Fink indicated that these figures represent the net profits SPI/CDS earned from DBE contracts during their respective tenures. The Government does not dispute these figures.
[4] Fink was resentenced after the November 1, 2015 amendments to the Guidelines loss table, which resulted in a two-level reduction in his total offense level.

II[5]

Nagle and Fink challenge the District Court's loss calculation.[6]  We made clear in

Nagle I that the appropriate measure of loss in this case is the face value of the

fraudulently procured contracts minus the fair market value of the goods and services

provided and expenses incurred under those contracts.  See Nagle I, 803 F.3d at 180, 183.

We so held because "in a normal fraud case, 'where value passes in both directions

[between defrauded and defrauder] . . . the victim's loss will normally be the difference

between the value he or she gave up and the value he or she received.'"  Id. at 180

(quoting United States v. Dickler, 64 F.3d 818, 825 (3d Cir. 1995)).  Our decision was

also rooted in the Guidelines themselves—specifically, Note 3(E)(i), which provides that

sentencing courts "shall" reduce loss by "the fair market value of the property returned

and the services rendered[] by the defendant."  U.S.S.G. § 2B1.1 cmt. n.3(E)(i).

Neither our opinion in Nagle I nor the Guidelines offer a precise definition of "fair

market value."  Defendants offer their own interpretation of the term, arguing that "the

fair market value of the services rendered is by definition the stated contract price," and

that such measure necessarily includes any profits accruing to Defendants, as the service

---

[5] The District Court had jurisdiction under 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

[6] Our review of the District Court's "decision regarding the interpretation of the Sentencing Guidelines, including what constitutes 'loss,' is plenary," while we review factual findings for clear error.  United States v. Napier, 273 F.3d 276, 278 (3d Cir. 2001).

6

provider.[7]  Nagle Br. 14.  Defendants assert that because "[t]he contracts at issue here were fully and competently performed," the correct loss amount is zero, rather than the profits denied legitimate DBEs or obtained by SPI/CDS.  Fink Br. 16.

We disagree and offer two reasons why profit is an appropriate measure.  First, under "the classic formulation, '[f]air market value is the price at which . . . property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.'" Amerada Hess Corp. v. C.I.R., 517 F.2d 75, 83 (3d Cir. 1975) (quoting United States v. Cartwright, 411 U.S. 546, 551 (1973)).  Applying this principle to the DBE context, the Government as the willing buyer would expect that the seller is a DBE and in that circumstance would be willing to pay for its goods and services and otherwise compensate the entity for its work.  In the instant case, due to Defendants' fraud, the Government was unaware of an especially relevant fact: that Defendants, rather than legitimate DBEs, would be performing the federally-sponsored contracts, "the primary purpose" of which "is to help small minority-owned businesses develop and grow, creating new jobs and helping to overcome the effects of past discrimination in the construction industry."  United States v. Maxwell, 579 F.3d 1282, 1306 (11th Cir. 2009). Thus, the Government—which contracted with Defendants under the mistaken impression that they were DBEs—"did not receive the entire benefit of their bargain"; it paid for the provision and installation of concrete beams by DBEs, and got the provision

---

[7] We have observed that "evidence of the contract price may be relevant to the issue of fair market value, but it is not controlling."  Chatlos Sys., Inc. v. Nat'l Cash Register Corp., 670 F.2d 1304, 1306 (3d Cir. 1982).

7

and installation of concrete beams by non-DBEs instead. See Nagle I, 803 F.3d at 171-72, 182. As a result, the Government did not achieve the goals of the DBE program and provided profit opportunities to entities not entitled to them. See id. at 183. Thus, using the profit Defendants received is an appropriate measure for loss.[8]

Second, other measures for loss in this case are unduly complex to calculate. With respect to the fraudulently-obtained DBE contracts, "[i]t is conceivable that the [G]overnment paid a premium contract price above what it would pay for other contracts under normal competitive bidding procedures." United States v. Martin, 796 F.3d 1101, 1111 (9th Cir. 2015). Here, then, any difference between what the Government paid Defendants for the performance of the contracts, intended for DBEs, and what it would have paid for the performance of the contracts under normal competitive bidding procedures, is an accurate measure of loss. See id. However, given the duration of the fraud—approximately fifteen years—and the sheer number of contracts involved—over 300—this figure would be exceedingly difficult to calculate. Under these circumstances, the District Court properly relied on Defendants' net profits—in other words, the gain

---

[8] In Nagle I, we provided examples of what the District Court ought to consider in calculating fair market value, including "the fair market value of the materials supplied, the fair market cost of the labor necessary to assemble the materials, and the fair market value of transporting and storing the materials." Nagle I, 803 F.3d at 183. Nowhere in this discussion did we state that Defendants' profit is or must be included as part of what constitutes fair market value. This makes sense. Nagle I sought to ensure that Defendants receive credit for benefits they provided to the Government. The materials and services they provided to build the bridges inured to the Government's benefit. The profits Defendants received did not. Thus, it is consistent with Nagle I not to credit Defendants with their fraudulently-obtained profits.

resulting from their offenses—as the loss here.[9]  See U.S.S.G. § 2B1.1 cmt. n.3(B)

(authorizing sentencing courts to "use the gain that resulted from the offense as an

alternative measure of loss" when loss cannot otherwise "reasonably . . . be determined").

Accordingly, we will affirm the District Court's loss calculation and resulting

sentences.[10]

---

[9] We do not mean to suggest that it is up to the District Court rather than the Government to calculate loss in the first instance—it is well-established that the Government bears the burden of establishing loss for sentencing purposes, see, e.g, United States v. Jimenez, 513 F.3d 62, 86 (3d Cir. 2008)—only that is not feasible to determine what the Government would have paid for the non-DBE performance of the hundreds of contracts in this case.

[10] In addition to challenging the District Court's loss calculation, Fink argues that the District Court improperly rejected his request for a downward variance due to his age. This argument is unavailing.  The District Court considered Fink's argument that he is entitled to a downward variance due to his age and expressly rejected it, reasoning that "[w]ith regard to the age factor," it was reluctant to "give a sentence that would encourage elderly people to commit crimes and then get the benefit of their age as an excuse."  Fink Appendix ("F. App.") 88.  The District Court also specifically commented on and rejected Fink's related claim that due to his age, he would have "an increased need for health services," F. App. 87, observing that such an argument is "hypothetical" and that Fink is not currently experiencing any health problems.  F. App. 88.  Finally, immediately following this discussion, the District Court acknowledged the "great" "collateral consequences" in this matter, but stated that such consequences must be "weigh[ed] against the major role that [Fink] played in the offense and the extent both in time and the amount that was involved."  F. App. 88.  The District Court's discussion of the age issue and Fink's individual circumstances thus belies Fink's claim that it "declared a practice or policy of not providing departures or variances for elderly defendants," Fink Br. 27, and shows that it meaningfully considered Fink's arguments. Because its decision is amply supported by the record, the District Court did not abuse its discretion in declining to grant a variance based on Fink's age.  See United States v. Flores-Mejia, 759 F.3d 253, 259 (3d Cir. 2014) (en banc).

We also reject Fink's claim that his sentence is substantively unreasonable because the District Court miscalculated the loss amount.  As indicated in the text, it did no such thing.  To the extent Fink argues that his sentence is substantively unreasonable based on his age and the non-violent nature of the offense, we agree with the Government that "a 41-month sentence for a 70-year old first time offender who, for at least fifteen

III

For the foregoing reasons, we will affirm the sentences imposed by the District Court.

---

years, presided over the largest reported DBE fraud in the history of the U.S. Department of Transportation is not unreasonable." Gov't Br. 59.