PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

Nos. 14-3184 and 14-3422
———

UNITED STATES OF AMERICA

v.

JOSEPH W. NAGLE,
                    Appellant, No. 14-3184
        ERNEST G. FINK,
                    Appellant, No. 14-3422
———

On Appeal from United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 1-09-cr-00384-001)
(M.D. Pa. No. 1-09-cr-00384-002)
District Judge:  Honorable Sylvia H. Rambo
———

Argued April 27, 2015
Before:  FISHER, HARDIMAN, and ROTH, *Circuit Judges*.

(Filed: September 30, 2015)

William M. Kent, Esq.   *ARGUED*
1932 Perry Place
Jacksonville, FL 32207
        *Counsel for Joseph W. Nagle*

Ellen C. Brotman, Esq.   *ARGUED*
Griesing Law
1717 Arch Street
Suite 3630
Philadelphia, PA 19103

Erin C. Dougherty, Esq.
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street
28th Floor
Philadelphia, PA 19109
        *Counsel for Ernest G. Fink*

Bruce Brandler, Esq.   *ARGUED*
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

Jenny C. Ellickson, Esq.   *ARGUED*
United States Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W., #1264
Washington, DC 20530


*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Joseph Nagle and Ernest Fink were co-owners and executives of concrete manufacturing and construction businesses. The businesses entered into a relationship with a company owned by a person of Filipino descent. His company would bid for subcontracts on Pennsylvania transportation projects as a disadvantaged business enterprise. If his company won the bid for the subcontract, Nagle and Fink's businesses would perform all of the work.

Fink pled guilty to one count of conspiracy to defraud the United States. Nagle proceeded to trial, where a jury found him guilty of a myriad of charges relating to the scheme. Both defendants filed timely appeals. Nagle challenges the District Court's order denying his motion to suppress electronic evidence discovered during searches of the businesses' offices. Both defendants challenge the amount of loss the District Court found they were responsible for in calculating the appropriate Sentencing Guidelines range. We will affirm Nagle's conviction, vacate Nagle's and Fink's sentences, and remand for resentencing.

I.

A.

The United States Department of Transportation provides funds to state transportation agencies to finance transportation projects. These funds often go towards highway construction, provided through the Federal Highway Administration ("FHWA"), or towards mass transit systems,

3

provided through the Federal Transit Administration ("FTA"). In Pennsylvania, the FHWA provides funds to the Pennsylvania Department of Transportation ("PennDOT"), and the FTA provides funds to the Southeastern Pennsylvania Transportation Authority ("SEPTA").

Federal regulations require states that receive federal transportation funds to set annual goals for participation in transportation construction projects by disadvantaged business enterprises ("DBEs"). 49 C.F.R. § 26.21. A DBE is a for-profit small business that is at least 51% owned by an individual or individuals who are both socially and economically disadvantaged and whose management and daily operations are controlled by one or more of the disadvantaged individuals who own it. *Id.* § 26.5. A state agency will announce a DBE-participation goal when soliciting bids for a contract, and bids for the contract must show how the contractor will meet the goal. If the prime contractor is not a DBE, this is usually demonstrated by showing that certain subcontractors that will work on a contract are DBEs. States themselves certify businesses as DBEs. *Id.* § 26.81. A business must be certified as a DBE before it or a prime contractor can rely on its DBE status in bidding for a contract. *Id.* § 26.81(c).

Most importantly here, in order to count towards a contract's DBE participation, a DBE must "perform[] a commercially useful function on [the] contract." *Id.* § 26.55(c). Therefore, a certified DBE whose "role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation" cannot be counted towards DBE participation. *Id.* § 26.55(c)(2).

B.

In the 1950's Joseph Nagle's grandfather established

4

Schuylkill Products Inc. ("SPI"), a Pennsylvania-incorporated S-corporation, in Cressona, Pennsylvania. SPI manufactured concrete beams that are used in highway construction projects. In the 1980's, the Nagle family also established CDS Engineers, Inc. ("CDS"), to operate as a construction company for the concrete beams SPI manufactured. By 2004, CDS was a wholly-owned subsidiary of SPI. Neither SPI nor CDS qualified as or was certified as a DBE in any state.

In 1993, SPI was owned by two people: Nagle's father, Gordon, who owned 50.1% of SPI, and Fink, Nagle's uncle by marriage, who owned 49.9%. Gordon Nagle was the President and Chief Executive Officer of SPI, while Fink served as Vice-President and General Manager of SPI. That year, SPI entered into an arrangement with a company called Marikina Engineers and Construction Corp. ("Marikina"). Marikina was a Connecticut corporation owned and managed by Romeo P. Cruz, an American citizen of Filipino descent. Because Cruz was of Filipino descent, Marikina qualified as a DBE for FHWA and FTA projects. Marikina was certified as a DBE in Connecticut and Pennsylvania, among other states.

SPI and Marikina agreed that Marikina would bid to serve as a subcontractor for PennDOT and SEPTA contracts that had DBE participation requirements. If Marikina was selected for the subcontracts, SPI and CDS would perform all of the work on those contracts. SPI and CDS would pay Marikina a fixed fee for its participation but otherwise keep the profits from the scheme.

In practice, SPI identified subcontracts that SPI and CDS could fulfill, prepared the bid paperwork, and submitted the information to prime contractors in Marikina's name. SPI used stationery and email addresses bearing Marikina's name to create this correspondence. It also used Marikina's log-in information to access PennDOT's electronic contract

5

management system. CDS employees who performed construction work on site used vehicles with magnetic placards of Marikina's logo covering SPI's and CDS's logos. SPI and CDS employees used Marikina business cards and separate cell phones to disguise whom they worked for. They also used a stamp of Cruz's signature to endorse checks from the prime contractors for deposit into SPI's bank accounts. Although Marikina's payroll account paid CDS's employees, CDS reimbursed Marikina for the labor costs.

In 2004, Gordon Nagle passed away. Joseph Nagle inherited his father's 50.1% stake in SPI and assumed the titles of President and Chief Executive Officer. At that time, Fink became the Chief Operating Officer and Chairman of the Board. SPI's relationship with Marikina lasted until March 2008. Between 1993 and March 2008, Marikina was awarded contracts under the PennDOT DBE program worth over $119 million and contracts under the SEPTA DBE program worth over $16 million. Between 2004 and March 2008, Marikina was awarded contracts under the DBE programs worth nearly $54 million.

## C.

SPI's and CDS's offices were all located in the same compound in Cressona. None of the offices was open to the public. SPI's administrative office was a converted, two-story white house. The house was subdivided into offices and cubicles. Between twelve and fifteen people worked in the building, as well as Nagle and Fink. CDS's administrative office was also a converted house, owned by Fink and leased to CDS. The compound contained a transportation building, a production building, and various parking lots. In total, SPI and CDS employed around 140 individuals who worked in the compound.

SPI and CDS purchased a computer for nearly every

6

employee who required one. They also created a shared network over a server. The twenty-five employees who had access to the network needed a user identification and password to access it. The network itself was compartmentalized into drives. Only five people, including Nagle and Fink, had access to all of the drives on the network. Emails sent from or received by SPI or CDS accounts were stored on the network as well. Nagle received a company computer, which he took home every night and used for business and personal purposes. He never used any other employee's computer.

In October 2007, the Federal Bureau of Investigation ("FBI") executed two search warrants at SPI's and CDS's offices. The warrants authorized agents to seize "business records of [Marikina] and all predecessors and affiliated operating entities, [SPI,] and CDS . . . including any and all" financial documents; contracts and invoices; payroll documents and personnel files; email and correspondence; phone records and calendars; and "[c]omputers and computer equipment." Nagle Supp. App. at 5, 65. During their search of SPI's and CDS's offices pursuant to the warrants, agents found eleven computers and the shared network server. The agents imaged the computers on site. Nagle had brought his computer home with him before the search, so it was not seized and imaged.

## D.

In November 2009, a federal grand jury in the Middle District of Pennsylvania returned an indictment against Nagle and Fink. The indictment charged them with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; eleven counts of wire fraud, in violation of 18 U.S.C. § 1343; six counts of mail fraud, in violation of 18 U.S.C. § 1341; one count of conspiracy to engage in unlawful

7

monetary transactions, in violation of 18 U.S.C. § 1956(h); and eleven counts of engaging in unlawful monetary transactions, in violation of 18 U.S.C. § 1957. Cruz, the owner of Marikina; Dennis Campbell, an SPI executive; and Timothy Hubler, a CDS executive, were indicted separately, pled guilty to the charges, and agreed to cooperate against Nagle and Fink.

Nagle and Fink jointly moved to suppress the electronic evidence that the FBI agents had imaged from SPI's and CDS's computers and network server during the October 2007 search. They argued (1) that the warrants were unconstitutional general warrants, (2) that the warrants were unconstitutionally overbroad, and (3) that the agents had executed the warrant in an unreasonable manner. The United States opposed the motion, contesting each of the arguments and also suggesting that Nagle and Fink lacked the requisite privacy interest to challenge the searches. The District Court held a hearing and took evidence. Two FBI agents and an FBI employee testified about the preparation and execution of the warrants as well as the FBI's review and analysis of the imaged data. Nagle and Fink testified about the history and structure of SPI and CDS, the two companies' computers and network use, and their own use of the companies' computer infrastructure.

After the hearing, Fink pled guilty to one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Nagle, however, continued his challenge to the search. In September 2010, the District Court denied Nagle's suppression motion. The District Court concluded that Nagle failed to show he had a personal expectation of privacy in the electronic information that the agents had imaged from SPI's and CDS's computers and network server. The District Court reasoned that Nagle never used the other employees'

8

computers and that "[w]hile [Nagle] may have had the expectation that, as President and CEO of SPI and CDS, the contents of the companies' server would remain private, he had this expectation in his official capacity as an executive and officer of these corporations as opposed to himself as an individual." Nagle App. at 21-22. Therefore, the District Court held that "Defendant has not demonstrated that any of *his* Fourth Amendment rights were violated, and thus his ownership of the companies whose records were seized is irrelevant." Nagle App. at 23-24.

On April 5, 2012, after a trial, a jury found Nagle guilty on all of the charges presented in the indictment except for four of the wire fraud charges.

### E.

Before deciding Nagle's motion to suppress, the District Court began the process of sentencing Cruz, Campbell, and Hubler. As part of that process, the District Court issued an opinion on the amount of loss they were responsible for, under U.S.S.G. § 2B1.1, in order to calculate the appropriate Guidelines range. *See United States v. Campbell*, No. 08-cr-7, 2010 WL 2650541 (M.D. Pa. July 1, 2010) [hereinafter "the *Campbell* loss opinion"]. The District Court concluded that Application Note 3(F)(ii) to § 2B1.1 was the appropriate legal standard to calculate the amount of loss; that under Note 3(F)(ii) the amount of loss was the face value of the contracts Marikina received; and that the defendants were not entitled to a credit against the loss for the work performed because they had not refunded the contract price to allow a legitimate DBE to perform the work. *Id.* at *3-6.

After Fink pled guilty and before Nagle's trial, a Presentence Report ("PSR") was prepared for him. The PSR relied on the *Campbell* loss opinion to conclude that the loss

9

Fink was responsible for was the face value of the PennDOT and SEPTA contracts Marikina received while he was an executive: $135.8 million. Under § 2B1.1(b), this amounted to a twenty-six-level increase in the Guidelines offense level. With other enhancements and adjustments, the PSR calculated Fink's total offense level to be thirty-five and assigned him a criminal history category of I. This corresponded to a Guidelines range of 168 to 210 months of incarceration, which was reduced to 60 months pursuant to 18 U.S.C. § 371. *See* U.S.S.G. § 5G1.1(a).

Fink objected to the loss calculation in the PSR on the basis that the proper loss amount was the pecuniary harm suffered by an actual DBE that did not receive the contracts— in other words, the profit an actual DBE would have received on the contracts. The District Court reserved ruling on the objection until after Nagle's trial.

After the jury's verdict, a PSR was prepared for Nagle as well. The PSR relied on the *Campbell* loss opinion to conclude that the loss Nagle was responsible for was the face value of the PennDOT and SEPTA contracts Marikina received while he was an executive: $53.9 million. This amounted to a twenty-four-level increase in the Guidelines offense level. With other enhancements, the PSR calculated Nagle's total offense level to be forty and assigned him a criminal history category of I. This corresponded to a Guidelines range of 292 to 365 months of incarceration.

Nagle objected to the loss calculation in the PSR on the grounds that (1) there was no evidence another DBE was willing to perform the contracts, (2) PennDOT and SEPTA received what they paid for under the contracts, and (3) the largest conceivable actual loss was the value of the contracts less overhead and expenses.

In February 2014, the District Court held a joint

10

hearing to address the issue of the amount of loss for both defendants. At the hearing, in addition to arguing that the proper loss amount was the face value of the Marikina contracts, the Government introduced evidence pertaining to the gross profits earned by SPI and CDS on the Marikina contracts during Fink's and Nagle's respective tenures as executives. Fink and Nagle both contested the profit amounts, which the Government asserted were several million dollars.

On May 7, 2014, the District Court held that Nagle was responsible for $53.9 million in losses and that no credit was permitted. On May 16, 2014, the District Court held that Fink was responsible for $135.8 million and that no credit was permitted.

The District Court then requested briefing on the appropriate amount of restitution. After briefing, the District Court rejected the Government's argument that the appropriate amount of restitution was the same as the amount of loss under the Guidelines. The District Court reasoned that SPI and CDS fully performed the contracts, so the Government received what it paid for. The District Court held that the Government was only entitled to the difference between the face value of the contracts and what it would have paid SPI and CDS knowing that they were not DBEs. However, because the Government failed to prove what this difference was, the District Court found that no restitution was appropriate.

The District Court sentenced Nagle first. He requested a ten-level downward departure in his offense level. Under the Guidelines, this corresponded to a loss amount of between $400,000 and $1 million. The District Court granted the departure and additionally lowered another enhancement by one level. With a final offense level of twenty-nine, the

District Court calculated Nagle's Guidelines range to be 87 to 108 months of incarceration. The District Court sentenced him to 84 months of incarceration, one year of supervised release, a $25,000 fine, a $2,600 special assessment, and no restitution.

The District Court then sentenced Fink. The Government moved for Fink to receive a ten-level downward departure in his offense level. Under the Guidelines, this corresponded to a loss amount of between $1 million and $2.5 million. The District Court granted the departure and lowered another enhancement by one level. With a final offense level of twenty-four, the District Court calculated Fink's Guidelines range to be 51 to 60 months of incarceration. The District Court sentenced him to 51 months of incarceration, one year of supervised release, a $25,000 fine, a $100 special assessment, and no restitution.

Nagle and Fink filed timely appeals.[1]

## II.

We first consider Nagle's challenge to the District Court's order denying his motion to suppress the electronic evidence seized from SPI's and CDS's offices. The District Court denied the motion because it concluded that Nagle did not show that he had a reasonable expectation of privacy in the places searched or items seized. We exercise plenary review over the District Court's legal conclusions but review its factual findings for clear error. *United States v. Silveus*, 542 F.3d 993, 999 (3d Cir. 2008).

A defendant who seeks to suppress evidence allegedly seized or discovered in violation of the Fourth Amendment

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

must first demonstrate that the Government physically occupied his property for the purpose of obtaining information or that he had "a legitimate expectation of privacy that has been invaded by government action." *Free Speech Coal., Inc. v. Att'y Gen.*, 677 F.3d 519, 543 (3d Cir. 2012) (internal quotation marks omitted); *cf. Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." (internal quotation marks omitted)). To have a legitimate expectation of privacy, the defendant must show "an actual or subjective expectation of privacy in the subject of the search or seizure" and show that "this expectation of privacy is objectively justifiable under the circumstances." *United States v. Donahue*, 764 F.3d 293, 298-99 (3d Cir. 2014) (internal quotation marks omitted). In other words, the expectation of privacy must be "one that society is prepared to recognize as reasonable." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (internal quotation marks omitted).[2]

No one disputes that SPI and CDS, as corporate entities, could challenge the search of their respective offices, whether through a motion to suppress—had they been

---

[2] This initial showing—that the defendant's property or legitimate expectation of privacy has been invaded—has been frequently referred to as "Fourth Amendment standing," to differentiate it from jurisdictional, Article III standing. *See, e.g.*, *United States v. Kennedy*, 638 F.3d 159, 163 (3d Cir. 2011). However, "this aspect of the analysis belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing." *Rakas*, 439 U.S. at 429.

charged with a crime—or through a *Bivens*[3] action. Nagle argues that because he is the majority owner of the small, family-operated corporations, he should have the same ability to challenge the searches that the corporations do. In other words, Nagle says, because the Government physically intruded on the corporations' property and otherwise invaded their legitimate expectations of privacy, and because he is the majority owner of the corporations, the Government physically intruded on *his* property and otherwise invaded *his* legitimate expectation of privacy. In support of that argument, Nagle cites a line from *New York v. Burger*: "An owner or operator of a business . . . has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable." 482 U.S. 691, 699 (1987).

But that expectation of privacy "is different from, and indeed less than, a similar expectation in an individual's home." *Id.* at 700. Although the Supreme Court has not clarified precisely how much "less" of an expectation of privacy a business owner has in commercial premises, we see a consensus among the Courts of Appeals that a corporate shareholder has a legitimate expectation of privacy in corporate property only if the shareholder demonstrates a personal expectation of privacy in the areas searched independent of his status as a shareholder.

In *United States v. SDI Future Health, Inc.*, the defendants were part-owners of an incorporated business and sought to challenge a warrant authorizing a search of the corporation's premises. 568 F.3d 684, 691, 694 (9th Cir. 2009). The Ninth Circuit rejected their argument that "mere ownership and management of" the corporation allowed them

---

[3] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

14

to challenge the search of the corporation's premises. *Id.* at 694. This was because "a reasonable expectation of privacy does not arise *ex officio*, but must be established with respect to the person in question." *Id.* at 696. However, the defendants could still show a legitimate expectation of privacy in the corporation's property if they "show[ed] some personal connection to the places searched and the materials seized" and "took precautions on [their] own behalf to secure the place searched or things seized from any interference without [their] authorization." *Id.* at 698. The court remanded the matter for further fact finding.

In *United States v. Mohney*, the defendant was the sole owner of an incorporated business and sought to challenge the search of the business's headquarters. 949 F.2d 1397, 1399, 1403 (6th Cir. 1991). The Sixth Circuit concluded that the defendant failed to show he had a reasonable expectation of privacy. *Id.* at 1404. The court concluded,

> Where the documents seized were normal corporate records not personally prepared by the defendant and not taken from his personal office, desk, or files, in a search that was not directed at him personally, the defendant cannot challenge a search as he would not have a reasonable expectation of privacy in such materials.

*Id.* at 1403.

*Mohney*, in turn, relied on a decision of the Second Circuit in *Lagow v. United States*, 159 F.2d 245 (2d Cir. 1946) (per curiam). Lagow was the "sole shareholder and officer of [his] corporation" and sought an order forbidding the use of evidence seized from the corporation in any future

15

trial against him. *Id.* at 246. The court rejected his claim, reasoning that Lagow chose "to avail himself of the privilege of doing business as a corporation" and, therefore, "he may not vicariously take on the privilege of the corporation under the Fourth Amendment . . . . Its wrongs are not his wrongs; its immunity is not his immunity." *Id.*

Finally, in *Williams v. Kunze*, one of the plaintiffs was the sole shareholder and president of a corporation and brought a *Bivens* action against an IRS agent who searched the company's records pursuant to a warrant. 806 F.2d 594, 597 (5th Cir. 1986). The Fifth Circuit found that summary judgment was properly granted to the federal agent because the shareholder could not challenge the search of the business's premises. *Id.* at 599. "An individual's status as the sole shareholder of a corporation is not always sufficient to confer upon him standing[4] to assert the corporation's [F]ourth [A]mendment rights. Unless the shareholder . . . can demonstrate a legitimate and reasonable expectation of privacy in the records seized," he cannot challenge the search. *Id.* (citation omitted). The court concluded that the shareholder could not show such a legitimate expectation of privacy in records seized from the common file room. *Id.* at 599-600.

These decisions all support a common proposition: a shareholder may not challenge a search of corporate property merely because he is a shareholder, but he may challenge the search if he "show[ed] some personal connection to the places searched and the materials seized," *SDI Future Health*, 568 F.3d at 698, and protected those places or materials from outside intrusion.

Even the cases in which a shareholder was permitted to

---

[4] *See supra* note 2.

16

challenge the search of corporate offices fall within this paradigm. In *United States v. Gonzalez, Inc.*, the shareholders of a corporation wished to challenge recordings from a wiretap placed in their corporation's office. 412 F.3d 1102, 1116 (9th Cir. 2005). The Ninth Circuit observed that "owners of the premises where an illegal wiretap occurs have standing[5] to challenge the interception, even if the owners did not participate in the intercepted conversations." *Id.* Because the shareholders owned the office themselves directly—and not indirectly through the corporation—the court found that they had the reasonable expectation of privacy necessary to challenge the wiretaps. *Id.* at 1116-17. The shareholders in *Gonzalez* showed a personal connection to the place searched in that they were the actual, direct owners of the property, and they showed effort to keep the conversations there private. Thus, *Gonzalez* falls within the larger circuit consensus.

So does *Henzel v. United States*, 296 F.2d 650 (5th Cir. 1961). The defendant in *Henzel* was also the sole shareholder and president of his business, and he sought to challenge evidence seized from the corporation. *Id.* at 650. The evidence seized was the corporation's business records, which were located in his office and most of which he personally created. *Id.* at 653. The Fifth Circuit concluded that he, therefore, "had an interest in the property seized and premises searched." *Id.* Again, Henzel showed a personal connection to the place searched—his office—and the items seized—records he personally created—and showed an effort to keep both private.

We find this line of authority persuasive and adopt it. To show he can challenge the search of SPI's and CDS's

---

[5] *See supra* note 2.

offices and the seizure of the employees' computers and network server as a shareholder and executive, Nagle must show a personal connection to the place searched or to the item seized and that he attempted to keep the place and item private. Nagle has failed to meet this standard.

The employees' computers that were seized and imaged were discovered in the employees' offices. Nagle did not show that he used these employees' offices, nor that he used their computers or accessed their files. Accordingly, he failed to show a personal connection to the computers or the place where they were discovered.

The server is, however, slightly more complicated. The server was not seized from his office. Therefore, Nagle must show a personal connection to the electronic files located on the server and that he kept them private in order to demonstrate a reasonable expectation of privacy. Nagle failed to show that he ever accessed other employees' files and emails on the server and, therefore, failed to establish a personal connection to their files. Although Nagle certainly had a personal connection to his own files and emails located on the server, he failed to show what efforts he made to keep *his* materials private from others. Although the server was password protected and only five individuals, including Nagle, had access to every drive on the server, Nagle did not establish where his files and emails were located on the server and how many people had access to those drives. Thus, Nagle did not meet his burden of proof to demonstrate a subjective expectation of privacy in his files and emails on the server.

For these reasons, we conclude that Nagle failed to establish that he had a reasonable expectation of privacy in the places searched and items seized or that the Government intruded onto *his* property. *See Free Speech Coal.*, 677 F.3d

at 543. Therefore, the District Court properly denied the motion to suppress.

III.

A.

Both Nagle and Fink challenge the District Court's calculation of the amount of loss they were responsible for under the Sentencing Guidelines. The District Court found that, under U.S.S.G. § 2B1.1, they were responsible for the face value of the contracts Marikina received without any credit for work done on the contracts. We review a criminal sentence for procedural and then substantive reasonableness. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc). Procedural reasonableness requires the District Court to calculate the correct advisory Guidelines sentencing range. *Id.* When the calculation of the correct Guidelines range turns on an interpretation of "what constitutes loss" under the Guidelines, we exercise plenary review. *United States v. Fumo*, 655 F.3d 288, 309 (3d Cir. 2011) (internal quotation marks omitted).

Section 2B1.1 of the Guidelines governs the calculation of the offense level for crimes involving, among other things, fraud and deceit. Subsection (a) provides the base offense level, which is either seven, if the offense has a maximum term of imprisonment of twenty years or more, or six. Subsection (b) provides an extensive list of adjustments for offense-specific characteristics. The first of these adjustments—and the one relevant to this appeal—is the adjustment for the amount of loss. As the loss increases, the offense level increases: for example, if the loss is more than $70,000, the court adds eight to the offense level; if the loss is more than $100 million, the court adds twenty-six to the offense level.

The main text of the Guidelines does not define "loss."

19

Instead, we turn to the application notes that accompany § 2B1.1. We "keep in mind that [G]uidelines commentary, interpreting or explaining the application of a guideline, is binding on us when we are applying that guideline because we are obligated to adhere to the Commission's definition." *United States v. Savani*, 733 F.3d 56, 62 (3d Cir. 2013) (citing *Stinson v. United States*, 508 U.S. 36, 43 (1993)).

Note 3(A) to § 2B1.1 states that "loss is the greater of actual loss or intended loss." "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense"; intended loss "means the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i)-(ii). In addition to this general definition, Note 3(F) gives some "special rules [to] be used to assist in determining loss" "[n]otwithstanding subdivision (A)." *Id.* cmt. n.3(F). One of these "special rules" is for "a case involving government benefits (*e.g.*, grants, loans, entitlement program payments)." *Id.* cmt. n.3(F)(ii). In such a case,

> loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

*Id.*

Nagle and Fink insist that the amount of loss they are responsible for is not the face value of the contracts Marikina received; instead, they say that they are at least entitled to a credit for the services they performed on the contracts or that

the loss is $0. They argue that the District Court should have used Note 3(A) to calculate the amount of loss instead of Note 3(F)(ii) because the DBE program is not a "government benefit" and that under Note 3(A) they should receive a credit for completing the subcontracts. In the alternative, they argue that they are nonetheless entitled to a credit under Note 3(F)(ii). We need not decide whether the DBE program is a "government benefit" and, therefore, whether Note 3(A) or Note 3(F)(ii) applies; we conclude that under either application note, the amount of loss Nagle and Fink are responsible for is the face value of the contracts Marikina received minus the fair market value of the services they provided under the contracts.[6]

1.

Our case law makes clear that, in a normal fraud case, "where value passes in both directions [between defrauded and defrauder] . . . the victim's loss will normally be the difference between the value he or she gave up and the value he or she received." *United States v. Dickler*, 64 F.3d 818, 825 (3d Cir. 1995).[7] For example:

> We have repeatedly emphasized that the amount of loss in a fraud case, unlike

---

[6] Nagle and Fink rely heavily on the District Court's restitution order to argue that the amount of loss is $0. The Government did not file a cross-appeal for the restitution order, so it is not properly before us to determine whether it is correct or not. The restitution order does not affect our analysis of how to calculate the amount of loss under the Guidelines.

[7] *Dickler* interpreted § 2F1.1 of the Guidelines, which at the time was a separate section concerning fraud and deceit. However, in 2001, § 2F1.1 was merged into § 2B1.1.

that in a theft case, often depends on the actual value received by the defrauded victim. Thus, when a defendant obtains a secured loan by means of fraudulent representations, the amount of loss is the difference between what the victim paid and the value of the security, because only that amount was actually lost.

*United States v. Nathan*, 188 F.3d 190, 210 (3d Cir. 1999) (Becker, C.J.) (citation omitted). Relying on that logic, we concluded in *Nathan* that "[i]n a fraudulent procurement case" we calculate the amount of loss by "offset[ting] the contract price by the actual value of the components provided." *Id.* This loss calculation is similar to a classic method of remedying fraud: rescission of any agreements and restitution of the reasonable value of what the parties exchanged. *See Schwartz v. Rockey*, 932 A.2d 885, 889 (Pa. 2007); *Boyle v. Odell*, 605 A.2d 1260, 1265 (Pa. Super. Ct. 1992).

Applying this well-established principle here, the defrauded parties—the transportation agencies—gave up the price of the contracts and received the performance on those contracts. Therefore, we conclude that, if the standard definition of "loss" in Note 3(A) applies, the amount of loss Nagle and Fink are responsible for is the value of the contracts Marikina received less the value of performance on the contracts—the fair market value of the raw materials SPI provided and the labor CDS provided to transport and assemble those materials.

2.

We next turn to calculating the amount of loss assuming that the DBE program is a "government benefit"

22

and, therefore, the special rule of Note 3(F)(ii) applies. Under Note 3(F)(ii), the "loss" is "not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses." U.S.S.G. § 2B1.1 cmt. n.3(F)(ii). An example of this rule follows: "if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50." *Id.* The Government argues that the "benefits" are the face value of the contracts that Marikina improperly received. Nagle and Fink argue that the "benefits" are only the moneys that they "g[ot] and retain[ed] possession of," that is, the profit SPI and CDS earned on the contracts. Fink Reply Br. at 10 (internal quotation marks and emphasis omitted).

We find the Government's position persuasive, particularly in light of the goals of the DBE program. The DBE program cares about who performs the work. It assumes that performance of a contract allows a DBE to not only earn a profit on the deal but also to form connections with suppliers, labor, and others in the industry. The profit earned, therefore, is not the only benefit the DBE obtains when it receives the contract. Therefore, when SPI and CDS fraudulently received the transportation contracts, the DBE program assumed that all of the contract price was going towards benefiting a true DBE. Instead, the entire contract price was put towards a different use: profiting SPI and CDS and improving their business connections.

Nagle's and Fink's arguments to the contrary lose. They ask us to consider the definition of "benefit" under a different section of the Guidelines, § 2C1.1, governing offenses involving bribes in interpreting the term "benefit" for Note 3(F)(ii). We disagree that the appropriate comparison for the term "government benefit" is the benefit

23

that is offered as a bribe to an official. They also argue that the legislative history of § 2B1.1 shows that "benefit" means "net loss." *See* U.S.S.G. app. C, vol. II at 180-81 (2003). We find that the reference to "net loss" in this history refers to the example given at the end of the application note: the loss is the difference between the benefits they were intended to receive and the benefits they fraudulently received. *Cf. United States v. Tupone*, 442 F.3d 145, 153-54 (3d Cir. 2006). Here, as explained above, SPI and CDS were not intended to receive the subcontracts, so the loss is the difference between the intended benefits—$0—and the actual benefits received—the full contract price. Finally, they suggest that "benefit" only refers to the things got and retained and so means "profit." The DBE program allows true DBEs to form lasting relationships with suppliers, labor, and the broader industry; those relationships are things received and retained as a result of the program. Therefore, we agree with the Government that, if Note 3(F)(ii) applies, the benefits diverted from their intended use or obtained by unintended recipients is the entire value of the contracts Marikina received.

However, a different provision of the Guidelines requires a credit against the full face value of the contracts. Application Note 3(E)(i) to § 2B1.1 states that "the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected" shall be credited against the loss. *Id.* § 2B1.1 cmt. n.3(E)(i). Here, Note 3(E)(i) means that we must subtract the "fair market value" of the "services rendered" by SPI and CDS on the contracts before arriving at a final loss value.

The Government's argument that Nagle and Fink are not entitled to a credit under Note 3(E)(i) because as non-

DBEs they did not "render any valuable services," Fink Gov't Br. at 35, is unpersuasive. Although the DBE program cares about who performs the work, it also requires that the work be completed. The transportation agencies required—and received—the construction of concrete materials. They did not receive the entire benefit of their bargain, in that their interest in having a DBE perform the work was not fulfilled, but they did receive the benefit of having the building materials provided and assembled.

The Government also argues that Note 3(E)(i) does not apply to the "special rule" of Note 3(F)(ii), but we disagree for two reasons. First, the special rules of Note 3(F) apply "[n]otwithstanding subdivision (A)." *Id.* § 2B1.1 cmt. n.3(F). Thus, Note 3(F) only supplants Note 3(A) when it applies; it does not supplant the other subsections of Note 3. Second, the drafters of Note 3 knew how to indicate that no credits would be permitted. Note 3(F)(v), which governs certain types of misrepresentation schemes, specifically states that "loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, *with no credit provided for the value of those items or services*." *Id.* § 2B1.1 cmt. n.3(F)(v). Had the Sentencing Commission intended to preclude crediting services rendered against loss for Note 3(F)(ii), it would have used similar language as it used in Note 3(F)(v).[8]

The Government's primary argument is that other courts to have considered the issue of DBE fraud before us have not allowed a credit against the face value of the contracts received in calculating the loss. We do not find

_____

[8] At argument, the Government suggested we apply Note 3(F)(v) to calculate the loss on this appeal. We decline to address an argument raised for the first time at argument.

25

those cases persuasive on this point. First, two of the cases the Government relies on were decided using the previous Guidelines provision on fraud and deceit, § 2F1.1. *See United States v. Leahy*, 464 F.3d 773, 789-90 (7th Cir. 2006) (referring to § 2F1.1); *United States v. Bros. Constr. Co. of Ohio*, 219 F.3d 300, 317-18 (4th Cir. 2000) (same). This difference is important, because the old § 2F1.1 had an application note similar to current Note 3(F)(ii), which both courts relied on in reaching their holdings, but no application note similar to current Note 3(E)(i). *See* U.S.S.G. § 2F1.1 cmt. n.8(d) (2000). Therefore, neither the Fourth nor Seventh Circuits had occasion to consider whether Note 3(E)(i) required that the services rendered be credited against the loss. Second, although the Eleventh Circuit has also said that "the appropriate amount of loss . . . [is] the entire value of the . . . contracts that were diverted to the unintended recipient" under § 2B1.1,[9] that court merely relied on *Leahy* and *Brothers Construction* and did not consider whether Note 3(E)(i) made a difference in the analysis. *United States v. Maxwell*, 579 F.3d 1282, 1305-07 (11th Cir. 2009). Accordingly, we see nothing in these cases that convinces us that Notes 3(E)(i) and (F)(ii) do not work together to allow a credit for the fair market value of the services rendered

---

[9] The Government relies on similar language in our non-precedential opinion in *United States v. Tulio*, 263 F. App'x 258, 263 (3d Cir. 2008). That case is, of course, not binding on this Court, *see* 3d Cir. I.O.P. 5.7, and in any event only dealt with the issue in a cursory manner.

against the face value of the contracts.[10]

### 3.

We conclude that in a DBE fraud case, regardless of which application note is used, the District Court should calculate the amount of loss under § 2B1.1 by taking the face value of the contracts and subtracting the fair market value of the services rendered under those contracts. This includes, for example, the fair market value of the materials supplied, the fair market cost of the labor necessary to assemble the materials, and the fair market value of transporting and storing the materials. If possible and when relevant, the District Court should keep in mind the goals of the DBE program that have been frustrated by the fraud.

### B.

The Government alternatively argues that the error in calculating the amount of loss for Nagle and Fink was harmless. In the Government's view, the ten-level departures that the District Court granted for both Nagle and Fink essentially assigned them the loss figures they now ask for. Therefore, because they were ultimately sentenced with a Guidelines range that corresponded to the loss figures they asked for, the Government says that the loss miscalculation

---

[10] The Government's reliance on a worksheet from a Sentencing Commission training seminar is, therefore, misplaced. The worksheet relies on *Leahy* and *Tulio*, which we have rejected, and on our opinion in *Tupone*. We fail to see how *Tupone* supports the Government's position here. In *Tupone*, we concluded that the loss from a worker's compensation fraud was the difference between what the worker received and should have received. 442 F.3d at 153-56. We did not address whether he was entitled to a credit for services rendered.

had no effect on their sentences.

An erroneous Guidelines calculation is harmless such that we may not grant relief if it is "clear that the error did not affect the district court's selection of the sentence imposed." *United States v. Langford*, 516 F.3d 205, 215 (3d Cir. 2008). "Even when the sentence is below the Guidelines range, the record must be unambiguous that the miscalculation of the range had no effect." *Id.* at 217. Our review of the record indicates that the District Court's miscalculation of the loss amount likely affected the sentences Nagle and Fink received even with the ten-level departures. Of principal concern to us is that the District Court referred to the size of the loss it incorrectly calculated in sentencing Fink as one of the reasons for the sentence he received. *See* Fink App. at 249. Because it is not clear that the incorrect loss calculations did not affect the sentences imposed, we cannot conclude that the incorrect loss calculations were harmless.

IV.

For these reasons, we affirm Nagle's judgment of conviction, vacate Nagle's and Fink's sentences, and remand for resentencing.

HARDIMAN, *Circuit Judge*, concurring in part and concurring in the judgment.

I join all but Section III-A-2 of the opinion of the Court, and I concur in the judgment in full. Because the loss amount calculation in a DBE fraud case of this kind is governed by Application Note 3(A) to § 2B1.1 of the Sentencing Guidelines, I would hold that the "government benefits" provision does not apply here.

In *United States v. Nathan*, we characterized as "fraudulent procurement" a contractor's false statements to the Government that it would comply with the Buy American Act by not using foreign components in performing the contracts at issue. 188 F.3d 190, 194, 210 (3d Cir. 1999); *see also United States v. Biberfeld*, 957 F.2d 98, 99 (3d Cir. 1992) (describing as procurement fraud a contractor's concealment of the fact that his supplies originated in Pakistan). As in *Nathan*, the defendants here conspired to lie to the Government about their compliance with federal regulations in order to receive contracts that otherwise would have gone to others. This is classic procurement fraud.

The Sentencing Guidelines make clear that the loss calculation in a procurement fraud case is covered by the "general rule" of Application Note 3(A). A subdivision of that note, Note 3(A)(v)(II), specifically addresses how Note 3(A) is to be applied in procurement fraud cases. This suggests that Note 3(F)(ii), a "special rule" designed for cases involving the fraudulent receipt of public benefits like welfare payments, has no place in a procurement fraud case. I would therefore vacate and remand for the District Court to apply Note 3(A) in accordance with the guidance provided by the Court in Section III-A-1 of its opinion.

1