NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-4218
_____

UNITED STATES OF AMERICA

v.

TIMOTHY P. FOSTER,
                    Appellant
_____

No. 16-4230
_____

UNITED STATES OF AMERICA

v.

JAY FINDLING
a/k/a
Jay Finn

Jay Findling,
                    Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Nos. 1-14-cr-00324-001 and 1-14-cr-00324-002)
District Judge:  Hon. John E. Jones, III
_____

Submitted Under Third Circuit LAR 34.1(a)
October 13, 2017

Before:  CHAGARES, JORDAN, and FUENTES, *Circuit Judges.*

_____

OPINION[*]
_____

JORDAN, *Circuit Judge*.

Timothy Foster and Jay Findling appeal their sentences, arguing that the District Court unreasonably estimated the loss amount resulting from their fraudulent activities. Because we conclude that the District Court's loss calculation was reasonable, we will affirm.

## I.     Factual Background

Before his criminal activity was exposed, Foster was the Vice President for Quality Assurance at Rite Aid Corporation and was responsible for liquidating Rite Aid's surplus inventory while salvaging, to the fullest extent possible, its value. That responsibility included "finding a buyer for the product, negotiating its sale, invoicing the buyer for the inventory, and accurately reporting the sale to Rite Aid." (App. at 81-82.) On behalf of Rite Aid, Foster contracted with Jay Findling and Findling's company, J. Finn Industries, to carry out the liquidations. Foster and Findling, however, did not establish a simple business relationship. They became co-conspirators in a nearly decade-long fraudulent scheme to profit from the sale of Rite Aid's surplus inventory.[1]

_____

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1] Foster also conducted a separate fraudulent scheme with Joshua Baser, but Baser is not a codefendant in this case. Baser entered into a non-prosecution agreement with the Government in exchange for his cooperation and a $500,000 restitution payment to

## A. The Fraud Scheme

The scheme essentially proceeded in three steps. First, Foster and Findling negotiated sales of large quantities of surplus Rite Aid inventory with various third-party buyers for a given price. Second, the two defendants created fraudulent paperwork to make it appear that J. Finn Industries had purchased the inventory, obscuring that sales had already been orchestrated with third-party buyers. Third, Foster reported lower sale prices to Rite Aid than the actual prices that had been negotiated with the third-party buyers. The cash difference between the reported prices and the actual sale prices was pocketed by Foster and Findling.

Thus, while the defendants generated sales of $132,301,514, Rite Aid received only $102,576,432 from those sales. Foster and Findling shared the difference, $29,725,082, with Findling keeping seventy percent and Foster keeping thirty.

## B. Services That Foster and Findling Provided to Rite Aid

Notwithstanding the fraud, both Foster and Findling did provide services to Rite Aid, and those services had value. Foster's contribution is straightforward. He assisted in liquidating Rite Aid's surplus inventory, and, for his efforts, he received a salary, bonuses, stock, and other benefits. Identifying what Findling did and what it was worth is more complicated. He did help to secure third-party buyers for the surplus inventory, but witnesses provided conflicting accounts about what else he did for Rite Aid.

Rite Aid. The District Court found the total loss to Rite Aid from that fraud scheme to be $1,768,765. Foster, but not Findling, was held responsible for that loss. The Foster/Baser scheme and accompanying loss calculations are not subjects of this appeal.

3

Cheryl Hoffman, a witness called by the government, testified that Rite Aid used third-party processors to sort and categorize the surplus goods at the processors' warehouses. She said that Findling would make periodic visits to the warehouses but that his attempts to change the scanning and sorting procedures led to a "chaotic environment" that required her to intervene to manage his disruption. (App. at 19.) Nonetheless, Hoffman also stated that Rite Aid was incapable of liquidating its surplus inventory without the assistance of a liquidator such as Findling, and that Rite Aid hired a replacement for Findling after terminating its relationship with him.

Findling offered several witnesses to describe the breadth of services he provided to Rite Aid. Michael Cruey, a warehouse manager for one of Rite Aid's third-party processors, testified that Findling or his company were in contact with the warehouse "on an 'at least every other day' basis." (App. at 20.) According to Cruey, Findling visited the warehouses about once per quarter and would provide packing boxes. A certified letter from Steven Osbey, another warehouse supervisor, stated that "he spoke with Findling on a daily basis" and Findling "show[ed] Osbey's employees how to pack merchandise, load trailers, etc." (App. at 21.) Osbey said Findling's involvement in the distribution process helped to speed deliveries. Jennifer Graef, an employee for J. Finn Industries, testified that she reviewed Rite Aid's inventory lists for discrepancies, created truckload inventory lists that identified exact inventory and pallets in each truckload, and made transaction summaries. Graef also helped the warehouses identify missing pallets, and she and Findling both dealt with resale customer complaints. Finally, Jacques Scambouli, the CEO of another wholesale salvage liquidator, testified that Findling

4

"added value" to Rite Aid's surplus products by managing the sale, pricing, and logistics of shipments.

### C.     Findling's Expenses for Services Allegedly Provided to Rite Aid

Findling also alleged that he incurred unreimbursed expenses while performing liquidation services for Rite Aid. His expert witness, Robert Roberts, asserted that J. Finn Industries' "[b]usiness expenses [from 2001 to 2009] included warehouse rent, shipping costs, advertising, trucking, storage fees, insurance, office rent, commissions, shipping supplies, and utilities." (App. at 158.) However, even though J. Finn Industries had other clients besides Rite Aid, the expense records were not broken down or itemized to show which specific amounts were attributable to services provided to Rite Aid. Moreover, Roberts testified that he did not see any instances where Findling was not reimbursed by customers for shipping expenses, and J. Finn Industries' invoices show that third-party buyers were in fact charged for shipping and handling expenses. Jennifer Graef testified that inventory was never shipped to Findling, it was always sent directly to the third-party buyers. Graef further testified that while Findling would sometimes take some product back to his own warehouse, there is no evidence of the quantity of merchandise Findling took back or the cost of warehousing that merchandise.

## II.     Procedural History

Findling was charged with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and Foster was charged with making false statements, in violation of 18 U.S.C. § 1001(a)(2). They both pled guilty.

5

To decide their sentences, the District Court looked to the United States Sentencing Guidelines ("U.S.S.G." or "guidelines"), specifically to the provision related to crimes involving fraud. The pertinent guideline sets the base offense level in accordance with the amount of loss suffered by the victim. U.S.S.G. § 2B1.1(b). Thus, the District Court held a hearing at which it took evidence regarding Rite Aid's loss. Following the hearing, the Court found that the gross payments generated by the tainted sales totaled $132,301,514 but that Rite Aid received only $102,576,432 from those sales. The Court therefore concluded that the total loss to Rite Aid was, as earlier noted, $29,725,082.

Nonetheless, the District Court recognized that, under our rule in *United States v. Nagle*, 803 F.3d 167 (3d Cir. 2015), it had to consider the fair market value of services that Findling and Foster had provided to Rite Aid during the course of the scheme. Testimony was given about the fair market value of such services as provided by "pure" brokers and "pure" liquidators. *See supra* pp. 3-5. The District Court concluded that a pure broker is someone who "does not buy the inventory but instead is paid a commission to find someone else to buy the inventory." (App. at 25.) It further concluded that a pure liquidator is "someone who actually buys the inventory and then seeks to sell it … tak[ing] on additional risk due to ownership of the product." (App. at 25.) The Court ultimately found that Findling was neither a pure broker nor a pure liquidator, but was a "hybrid broker/liquidat[or.]" (App. at 36.) It reached that conclusion because Findling did more than locate third-party buyers; he involved himself in the day-to-day operations of liquidating surplus Rite Aid inventory, though he did not have the risk of a liquidator

6

because he always guaranteed himself a profit on the inventory and did not incur warehousing, transportation, shipping, or insurance costs associated with the surplus inventory.

Expert testimony established that a pure broker typically earns a 5-10% commission on his sales, while a "master liquidator" could expect to make from the "high teens" to 20% profit on his sales. (App. at 42.) The District Court said that, because "Findling's services [are] a hybrid of typical broker and liquidator services, … a reasonable estimate of the fair market value of his services is an approximate midpoint of the two ranges." (App. at 42.) The Court therefore determined that the fair market value of Findling's services was 14% of the total sale figure of $132,301,514, which equaled $18,522,212. The Court refused to credit against the amount of Rite Aid's loss any expenses that Findling claimed he incurred in performing his services for Rite Aid. Although he attempted to introduce evidence to show that he did in fact incur costs associated with those services, Findling offered no credible evidence quantifying his costs or demonstrating that they were not reimbursed by third parties as "shipping expenses" on customer bills. In sum, after giving credit for the value of Findling's services, the District Court found that Findling was responsible for a loss to Rite Aid of $11,202,870. Similarly, the Court determined that Foster was responsible to Rite Aid for a loss of $12,971,635.[2]

---

[2] The loss amount attributable to both Foster and Findling as a result of their fraudulent scheme was $11,202,870. The District Court attributed an additional $1,768,765 to Foster as a result of the fraudulent Foster/Baser scheme, which accounts for the higher loss attributed to Foster. *See supra* n.1. The District Court did not grant

7

Findling filed a motion for reconsideration, arguing that the District Court erred when it refused to grant him credit for business expenses against the loss it determined Rite Aid had suffered. The Court denied that motion.

Based on the estimated loss to Rite Aid of $11,202,870, Findling's total offense level was 25 and his corresponding sentencing range under the guidelines was 57-71 months of imprisonment. However, because the statutory maximum penalty for conspiracy to commit wire fraud is five years, the range was restricted to 57-60 months of imprisonment. The District Court ultimately determined that consideration of the 18 U.S.C. § 3553(a) factors warranted varying downward from the guidelines range, and it sentenced Findling to a 48-month term of imprisonment, plus 24 months of supervised release. He was also ordered to pay restitution.

Foster's sentencing range was 87-102 months of imprisonment, but again the applicable sentence was restricted to 60 months because the statutory maximum penalty for false statements is five years. The District Court sentenced him to a 60-month term of imprisonment, plus 24 months of supervised release. He too was ordered to pay restitution.[3]

Findling appealed, and so did Foster, although he did not submit his own briefing. Instead, Foster has adopted Findling's legal arguments in their entirety. *See* Fed. R. App.

---

Foster any credit against the loss amount because Rite Aid had already paid him a salary, which constituted the fair market value of his services.

[3] Findling and Foster are jointly and severally liable for the restitution amount.

8

P. 28(i) (permitting appellants to adopt by reference the brief of a co-appellant). Their overall argument is that the sentences are procedurally unreasonable.

## III. Standard of Review

"Procedural reasonableness requires the District Court to calculate the correct advisory Guidelines sentencing range. When the calculation of the correct Guidelines range turns on an interpretation of 'what constitutes loss' under the Guidelines, we exercise plenary review." *Nagle*, 803 F.3d at 179 (internal citation omitted) (quoting *United States v. Fumo*, 655 F.3d 288, 309 (3d Cir. 2011)). An estimate of the amount of loss is reviewed for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 56 (2007). Underlying factual determinations are reviewed for clear error. *United States v. Stinson*, 734 F.3d 180, 184 (3d Cir. 2013).

## IV. Discussion[4]

Findling raises two primary arguments on appeal:[5] that the District Court arrived at an unreasonable estimate of the loss suffered by Rite Aid as a result of the fraudulent scheme, and that the Court improperly placed the burden of persuasion on him to prove "credits against loss" under U.S.S.G. § 2B1.1 cmt. 3(E). We disagree on both counts.

---

[4] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

[5] For ease of reference, we refer to the arguments as Findling's, though, as stated before, they are Foster's as well since he has adopted them all.

The District Court did not abuse its discretion in calculating the loss Rite Aid suffered as a result of the Findling/Foster scheme because the calculation was based on a reasoned evaluation of the evidence presented by the parties.

"We 'keep in mind that [g]uidelines commentary, interpreting or explaining the application of a guideline, is binding on us when we are applying that guideline because we are obligated to adhere to the Commission's definition.'" *Nagle*, 803 F.3d at 179 (quoting *United States v. Savani*, 733 F.3d 56, 62 (3d Cir. 2013)). The commentary to § 2B1.1 provides that a district court "need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, cmt. 3(C).

The commentary also states that the loss to the victim should be reduced by the fair market value of the services provided to the victim through the fraudulent scheme. *See id.* § 2B1.1, cmt. 3(E). Specifically, the "[l]oss shall be reduced by … [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." *Id.* Those are known as "credits against loss." *See id.* We recently re-emphasized in *United States v. Nagle* that, "in a normal fraud case, 'where value passes in both directions [between the victim and the defrauder] … the victim's loss will normally be the difference between the value he or she gave up and the value he or she received.'" 803 F.3d at 180 (citation omitted).

10

Findling argues that the District Court's loss estimation was unreasonable for three reasons: first, the Court refused to allow any credit against loss for unreimbursed expenses incurred in working for Rite Aid; second, it mischaracterized the terms "net margin" and "gross margin," which Findling contends resulted in the District Court arriving at a higher loss estimate; and third, it arbitrarily selected a midpoint between the commission that would be earned by a pure broker and the profit that would be earned by a pure liquidator to estimate the fair market value of the services rendered by Findling. Each of those arguments is unpersuasive.

First, the District Court did not err in refusing to credit the unreimbursed expenses Findling says he incurred while working with Rite Aid because the Court fairly concluded that he did not present sufficient evidence to show that those supposed expenses were actually incurred during that work. In its initial loss-determination opinion, the Court noted that the only expenses Findling sought in his post-hearing brief were for "shipping expenses." (App. at 43.) Those expenses, the Court found, were reimbursed by third-party buyers. In denying Findling's motion for reconsideration, the Court provided further explanation for its "considered and conscious decision" not to credit Findling for any business expenses. (App. at 50.) The evidence Findling offered in support of his business expenses – yearly totals of expenses with "no itemization of detail whatsoever as to what [those] expenses were, or what amount [could] be attributed to services provided to Rite Aid" – was unhelpful in determining a reasonable estimate of the supposedly unreimbursed expenses. (App. at 52.) Not only did "the record [make] clear that much of Findling's asserted expenses … were either never incurred on behalf

11

of Rite Aid or were reimbursed by third party customers," (*id.*), but Findling also failed to "provide[] any detailed evidence of" unreimbursed expenses he specifically incurred on behalf of Rite Aid, (App. at 54). Accordingly, the Court did not err in deciding that there was not a sufficient evidentiary basis to use the alleged business expenses in estimating Rite Aid's loss.[6]

Second, though the District Court may have conflated the concepts of "net margin"[7] and "gross margin,"[8] that error was harmless because Findling's "net margin" was – given the state of the record – equivalent to his "gross margin." The District Court "conclude[d] that a 14% commission, or gross margin, [was] a fair and reasonable percentage to represent the fair market value of Findling and J. Finn Industries' extensive

---

[6] Findling argues that the Court impermissibly placed on him the burden of persuasion to prove his business expenses. The District Court, however, did not place the burden of persuasion on Findling to prove those expenses; it simply concluded that he had failed to meet the burden of production that was necessarily his. *See Fumo*, 655 F.3d at 310 ("[A]lthough 'the burden of persuasion remains with the Government, once the Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate.'" (quoting *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008))). As the Court aptly noted, "as a matter of common sense, it is logical that a defendant would have some evidentiary burden to prove the fair market value of his own services as an offset against the Government's proposed loss amount." (App. at 41 n.9.)

[7] "Net margin," also known as "net profit margin," is defined as the percentage value derived from the following formula: sales minus cost of goods and all expenses, and that amount divided by sales. *Net Profit Margin*, Black's Law Dictionary (10th ed. 2014).

[8] "Gross margin," also known as "gross profit margin," is defined as the percentage value derived from the following formula: sales minus cost of goods, and that amount divided by sales. *Gross Profit Margin*, Black's Law Dictionary (10th ed. 2014); (App. at 153.) The gross margin calculation makes "no adjustment … for additional expenses[.]" *Gross Profit Margin*, Black's Law Dictionary.

services to Rite Aid[.]" (App. at 42.)  To arrive at that 14% figure, the District Court roughly split the difference between the 5-10% commission a pure broker could expect to make and the approximately 20% "profit" a pure liquidator could expect to make.  (App at 42.)  Classifying the resulting 14% figure as "gross margin" was imprecise because the 20% profit that a pure liquidator could expect to make seems better classified as a "net margin" not a "gross margin" figure, given that it excludes the liquidator's expenses.  In other words, if one of the two inputs that went into the District Court's "gross margin" analysis was actually a "net margin," then classifying the resulting 14% figure as "gross margin" was a less-than-ideal description.

Nevertheless, that language slip does not affect the validity of the Court's reasoning in this instance.  Findling is correct that the difference between "gross margin" and "net margin," as relevant here, is that "net margin" excludes all expenses, while "gross margin" does not.  But we have already determined that the District Court did not err in refusing to accept Findling's poorly supported allegations about unreimbursed business expenses (the only expenses Findling has pointed to), so there is effectively no difference in this case between the "gross margin" and the "net margin," for purposes of loss calculation.  Thus, any error in the use of the terms "net margin" and "gross margin" was harmless.[9]  *See Forrest v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005) (stating

---

[9]  Findling argues that the District Court was "right to view a 'gross margin' figure … as the proper measure of 'value received,'" but that it erred by employing "a figure selected from a range of profit levels, which represente[d] net margin after expenses, rather than gross margin, as [the Court] otherwise indicated." (Opening Br. at 18 (emphasis omitted).)  The District Court in its motion for reconsideration opinion, however, clarified that it did consider expenses when selecting 14% as the appropriate

that an error is harmless "if it is 'highly probable' that the error did not affect the outcome of the case" (citation omitted)).

Finally, the District Court's use of a midpoint range between the commission earned by a pure broker and the profit earned by a pure liquidator to determine the fair market value of the services rendered by Findling was not arbitrary. It was based on careful consideration of the evidence. When a district court must pick from among a range of plausible estimates in determining an important sentencing factor, it may choose any value supported by the evidence. *United States v. Miele*, 989 F.2d 659, 665-66 (3d Cir. 1993).

Here, the District Court's selection of a midpoint value had an evidentiary basis, namely "the evidence and testimony presented at the [loss-determination] hearing," which led the District Court to categorize the services Findling provided Rite Aid "as a hybrid broker/liquidation service." (App. at 36.) The Court reached that conclusion

_____

figure to calculate the fair market value of Findling's and J. Finn Industry's services. (*See* App. at 52 n.5 (discussing how the Court took into consideration Findling's handling of "'infested' merchandise ... when [it] decided to characterize Findling's services as not only broker services but liquidation services, and thus 'credited' this type of service he provided"); App. at 55 ("Lastly, we reiterate that our calculation of the fair market value of the hybrid broker/liquidation services that Findling provided to Rite Aid also included the fair market value of the services provided by J. Finn Industries as [a] whole. ... Thus, to the extent that Findling seeks credits for the expenses of his employees, we have already 'credited' against the loss ... the value of his employees' labor." (internal citations omitted)); *see also* App. at 42 (concluding that "a 14% commission, or gross margin, is a fair and reasonable percentage to represent the fair market value of Findling and J. Finn Industries' extensive services ... based on all the evidence in the record").) Accordingly, any error in terminology is, as discussed above, harmless, because the District Court did factor expenses into its analysis; it just did not provide Findling additional credits against loss for business expenses it rightly concluded Findling failed to quantify.

because Findling heavily involved himself in the day-to-day operations of the efforts to liquidate surplus Rite Aid inventory, but he did not have the risk of a liquidator because he always guaranteed himself a profit on the inventory and he did not incur warehousing, transportation, shipping, or insurance costs associated with the surplus inventory. There was no error in the Court's value assessment.

## V.    Conclusion

For the foregoing reasons, we will affirm the sentences the District Court imposed on Findling and Foster.[10]

---

[10] Because we conclude that the District Court did not abuse its discretion in calculating the loss suffered by Rite Aid, we need not address Findling's request to vacate and remand the District Court's restitution order.